# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| KAREN ANNE LEVERT-WOITALLA, | Civil No. 11-238 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| CARVER COUNTY, CARVER COUNTY SHERIFF'S OFFICE, OFFICER JASON BREUNIG, | |
| Defendants. | |

Bryan R. Battina, **BATTINA LAW, PLLC**, 1907 East Wayzata Boulevard, Suite 170, Wayzata, MN 55391, plaintiff.

Jon K. Iverson and Stephanie A. Angolkar, **IVERSON REUVERS, LLC**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

Three officers were called to investigate a 911 report of domestic disturbance at the home of Karen Anne LeVert-Woitalla. The officers' investigation of that report ultimately resulted in Woitalla's arrest for obstruction of legal process. Woitalla sued Carver County, the Carver County Sheriff's office, and Officer Jason Breunig alleging various state law tort claims as well as excessive force, false arrest, and false imprisonment under 42 U.S.C. § 1983. (Am. Compl., July 25, 2011, Docket No. 21.) Woitalla now moves for partial summary judgment on her false arrest and unlawful entry claims only. Because the Court finds that there are genuine issues of material fact as to

whether Woitalla consented to the entry and whether the officers had probable cause to arrest Woitalla, the Court will deny Plaintiff's motion.

## BACKGROUND

Just after 3:00 p.m. on December 21, 2009, Corporal Jason Breunig and Sergeant Eric Kittelson responded to a 911 call reporting a domestic disturbance in Chanhassen, Minnesota.  (Sergeant Eric Kittelson Aff., Ex. A at 1, June 17, 2011, Docket No. 15 ("Kittelson Report").)  Dispatch reported that a male and female were fighting outside in the driveway.  (*Id.*)  Another officer, Detective Thiele, arrived first on the scene; when Breunig and Kittleson arrived, Thiele was speaking with a man later identified as Jorge Louis Espinoza in the driveway.  (*Id.*; Bryan R. Battina Aff., Ex. C, Probable Cause Hr'g Tr., at 9:17-10:10, Oct. 21, 2011, Docket No. 25 ("Hr'g Tr.").)  Breunig and Kittelson approached Thiele and Espinoza in the driveway.  Breunig asked Espinoza if there was anyone in the house, and Espinoza replied "Yeah, Danielle and her mom." (Corporal Jason Breunig Aff., Ex. A at 1, June 17, 2011, Docket No. 14 ("Breunig Report"); Hr'g Tr. at 33; Stephanie Angolkar Aff., Ex. A ¶ 20, Nov. 11, 2011, Docket No. 30 ("Interrog. Answers.").)  Breunig did not know who these individuals were.  (*Id.*) Breunig approached the house and Kittleson followed.  (Kittelson Report at 1.)

The glass storm door was closed, and the inside front door was open.  (*Id.*)  The house was quiet as Breunig peered through the glass door; Breunig did not observe signs of damage or hear sounds of distress.  (Hr'g Tr. at 52:4-16.)  Bruenig opened the storm door slightly and yelled inside: "Sheriff's Office."  (Breunig Report, at 1.)  A dog then

came to the door and started to bark, growl, and bare its teeth. (*Id.*) Breunig again cracked the door and shouted inside, "Can someone control the dog please." (*Id.*) Breunig shut the door and waited outside. (*Id.*) Woitalla "came to the door and called the dog off so [Breunig] could enter the residence."[1] (*Id.*) Breunig followed her into the living room. (*Id.*) Breunig told Woitalla that the officers were investigating a report of a fight in the driveway, and asked her who was arguing there. She responded: "Don't you make a fucking scene in front of my four year old granddaughter!" (*Id.*) Woitalla eventually responded that the fight was probably between her daughter and her daughter's boyfriend and that they had left. (*Id.*) Woitalla then said "Get the fuck out of my house!" (*Id.*; Hr'g Tr. at 39.)

Breunig did not know whether there were other people in the house, and he was unable to determine Woitalla's role in the dispute. (Breunig Report at 1; Interrog. Answers ¶ 20.) Both Breunig and Kittelson – who had joined Breunig in the house after he heard Woitalla yelling – explained to Woitalla that they needed to identify her in order to investigate the domestic disturbance. (*id.*; *see also* Interrog. Answers ¶ 13.)[2] Woitalla refused Breunig's request to see her identification. (Breunig Report at 2; Interrog.

---

[1] Breunig testified at the probable cause hearing that Woitalla "grabbed onto [the dog] and got it out of the way. I don't remember how she retrained it." (Hr'g Tr. at 51.) Counsel then asked: "And then when she pulled the dog back you stepped into the house, correct?" "That's correct," Breunig responded. (*Id.*) Breunig agreed that he was not verbally invited into the house: Woitalla "didn't tell me to come in, no." (*Id.*)

[2] Kittelson in particular – having at this point recognized Woitalla from previous encounters about her daughter, and recalling her to be cordial and reasonable – attempted to deescalate the situation by reminding her of those interactions, and saying that the officers were just there to investigate a report, and not to harass her or cause a problem. (Hr'g Tr. at 74-76.)

Answers ¶ 20; Hr'g Tr. at 39.)   The officers continued to question Woitalla.   While Breunig and Kittelson were questioning Woitalla, the family dog was circling the deputies with its tail between its legs, ears pinned back and lips curled.  (Kittelson Report at 2; Hr'g Tr. at 41, 51.)   Woitalla refused the officers' repeated requests for her to put the dog away.   (Kittelson Report at 2; Hr'g Tr. at 73.)   Kittelson alternatively proposed that they step outside to continue talking.   (Kittelson Report at 2; Hr'g Tr. at 76.) Woitalla again refused.   (*Id.*)

Woitalla started to walk toward the door where Kittelson was standing.  (Breunig Report at 2; Hr'g Tr. at 39-40.)   Kittelson believed that she was complying with his previous request to either put the dog away or step outside to talk.  (Hr'g Tr. at 76.) Kittelson followed her toward the door, and Bruenig followed Kittelson.   (Interrog. Answers ¶ 20; Hr'g Tr. 76.)   The area by the front door is small, with an open staircase to the basement.  (Hr'g Tr. 70:19-25; *see also id.* at 78:23-25; 80:6-7.)   Kittelson's boots were slippery.  (Hr'g Tr. at 77:10-18.)   Woitalla stopped abruptly when she was inches from the front door, turned around, and put her hand up to push past Kittelson and reenter the house.  (Interrog. Answers ¶ 20; Hr'g Tr. at 76:14-78:6.)   Kittelson said, "No we're going outside."  (*Id.* at 77:23.)

Woitalla walked into Kittelson with her hand out, "touch[ing]" him on the chest, giving him a "slight push."  (Hr'g Tr. at 78:4-6; 79:24-25.)   Kittelson grabbed her right wrist with his left hand "to prevent her from pushing me back and potentially down the stairs or over the rail."  (Hr'g Tr. at 78:4-6; 80:5-7.)   Woitalla reacted strongly to Kittelson's hand on her wrist, swearing and struggling.  (*Id.* at 80:8-13.)   Meanwhile, the

dog was behind the deputies snapping.  (*Id.* at 77:19-21.)  As the three individuals were squeezed into the tight entryway, Kittelson heard Breunig shout, "I've been bit."  (Hr'g Tr. at 78:6-9.)   Upon hearing about the bite, Kittelson took out his aerosol irritant projector (AIP) intending to defend himself against the dog.  (Interrog. Answers ¶ 20; Hr'g Tr. at 78:6-9.)  But then Kittelson noticed the child pop her head up over the couch, and he decided not to use the AIP because exposure is not recommended for small children.  (Interrog. Answers ¶ 20; Hr'g Tr. at 78:10-18.)   Woitalla continued to swear and struggle after Kittelson took her wrist.  (Interrog. Answers ¶ 20; Hr'g Tr. at 80:8-25.)  At this point Kittleson said that Woitalla was under arrest.  (*Id.*)  Breunig took hold of Woitalla to assist Kittelson as she flailed her arms.  (Interrog. Answers ¶ 20; Hr'g Tr. 41:14-20, 78:22-25.)  Breunig held Woitalla against the closet as Kittelson got the front door open, and then the deputies brought her outside.  (Hr'g Tr. at 78:25-79:2.)

Woitalla was charged with gross misdemeanor obstruction of legal process with force.  At the hearing on this charge, additional charges of obstruction of legal process and disorderly conduct were added.  (Anglolkar Aff., Ex. C, Crim. Compl.)

## ANALYSIS

## I.       STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     WOITALLA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Woitalla moves for summary judgment on her § 1983 claims of unlawful entry and the resulting arrest and imprisonment. The Court will address each claim in turn.

### A.     Entry

Absent consent or exigent circumstances a warrantless search of an individual's home violates the Fourth Amendment. *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). Officers do not violate the Fourth Amendment if they have an objectively reasonable, good-faith belief that the occupant voluntarily consents. *See Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990). "An invitation or consent to enter a house may be implied as well as expressed." *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975). But consent may not be voluntary where one opens the door to a demand under color of authority. *United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006). The issues are whether Woitalla consented to the entry and whether the exigent circumstances exception applies.

Defendants rely on *Turbyfill* in arguing that Breunig had an objectively reasonable, good faith belief that Woitalla consented to his entry. The Eighth Circuit

found implied consent where police rang the doorbell and identified themselves, and one of the defendants opened the inside door a few feet and stepped back.  *Turbyfill*, 525 F.2d at 58.  Consent existed even though it was the police who physically opened the unlocked screen door and entered the home.  *Id.* at 59.[3]

Woitalla argues that her behavior was not implied consent, but merely a response to a demand made under color of authority.[4]  *See United States v. Conner*, 127 F.3d 663, 666 & n.2 (8th Cir. 1997) (no consent where defendant did not open the door until officer shouted "open up").  In other words, Woitalla argues that she did not consent because Bruenig's actions – namely identifying himself and asking Woitalla to control her dog – conveyed a message that compliance with his request was required.  *See United States v. Jerez*, 108 F.3d 684, 692-93 (7th Cir. 1997).  In Woitalla's rendering, the decisive fact is that Breunig, not Woitalla, opened the storm door to enter the house; Woitalla merely restrained the dog and backed up.  *See Poe*, 462 F.3d at 1000 (no implied consent where

---

[3] More precisely, the Eighth Circuit found no error in the district court's determination that the defendant's act of opening of the door and stepping back constituted an implied invitation to enter.  *See Turbyfill*, 525 F.2d at 59.  Other circuits have found implied consent under similar circumstances.  *Pavao v. Pagay*, 307 F.3d 915, 920 (9th Cir. 2002) (resident fully opened the front door and stepped back into the living room); *United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976) (resident's stepping back and leaving the door open constituted consent); *Robbins v. MacKenzie*, 364 F.2d 45, 48 (1st Cir. 1966) (resident's unlocking and opening the door was consent to talk, and walking back into the room was an implied invitation to talk inside).

[4] Woitalla's objection that Breunig's claim of consent was manufactured for litigation purposes is rather beside the point.  True, Breunig testified at the probable cause hearing that Woitalla did not expressly invite him into the home.  But this fact speaks only to the issue of direct consent.  Whether Breunig initially advanced a consent theory is irrelevant to whether consent can be objectively implied.

defendant opened door following over ten minutes of persistent knocks and requests to open the door).

The Court finds that reasonable jurors could differ as to whether Woitalla impliedly consented to Officer Breunig's entry. Consent is assessed under the totality of the circumstances. *See Poe*, 462 F.3d at 1000. After Breunig announced "Sheriff's Office" and asked someone in the house to control the barking dog, Woitalla called off her dog and allowed Officer Breunig to open the unlocked screen door and follow her into the entry of the home on a cold winter day. This record does not compel the conclusion that consent was lacking.

Moreover, the cases on which Woitalla relies have much stronger facts than a single officer's self-identification and request to control a dog. In *Jerez*, at 11:00 p.m. deputies knocked on a motel door for three minutes, commanded the inhabitants of the hotel room to open the door, knocked on the outside window for one-and-a-half to two minutes, and shined a flashlight through an opening in the drapes onto the defendant's face as he lay in bed. 108 F.3d at 687, 692-93 ("Simply stated, this is a case in which the law enforcement officers refused to take 'no' for an answer."). In *Connor*, there were four police officers positioned near the door, police knocked on the door longer and more vigorously than would an ordinary member of the public, knocking was loud enough to wake up a guest in a nearby room, and the inhabitant of the room only opened the door after police commanded him to "open up." 127 F.3d at 665-66 & n.2 (finding no error in the district court's conclusion that consent was lacking). In *Poe*, the police knocked for

over ten minutes and repeatedly requested that the inhabitant open the door.  462 F.3d at 1000.

To summarize, these cases suggest that no consent can be implied where the officers' conduct was such that no reasonable inhabitant would perceive any other option but to "open up."  Breunig's request – "can someone control the dog please" – was not an "open up"-style request.  That is, it was not the kind of demand under color of authority that would benumb the listener into compliance, rendering defective any inference of consent.  A genuine dispute of material fact therefore exists as to whether Woitalla consented to the entry, and the Court will deny her motion for partial summary judgment on the unlawful entry claim.  Because a fact question exists as to consent, the Court need not reach the applicability of the exigent circumstances exception.

### B.     Arrest

Probable cause must exist to justify a warrantless arrest.  *United States v. Adams*, 346 F.3d 1165, 1169 (8th Cir. 2003).  The existence of probable cause is assessed at the time of arrest.  *Id.*  Probable cause exists if "the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested."  *Id.*  Kittelson arrested Woitalla for gross misdemeanor obstruction of legal process with force.  That arrest was based on her conduct: pushing Kittelson's chest and obstructing of the officers' domestic disturbance investigation.  An individual is guilty of that offense when she "obstructs, resists, or interferes with a peace officer while the officer is engaged in the performance of official

duties." Minn. Stat. § 609.50, subd 1(2). The use of force renders the offense a gross misdemeanor. Minn. Stat. § 609.50, subd 2(2). The question is thus whether Kittelson had arguable probable cause to arrest Woitalla for that offense under the circumstances.

The Court finds that he did. Woitalla was yelling, swearing, and pacing back and forth despite officers' efforts to calm her down and explain the purpose of their presence. The dog was encircling the officers, barking, and baring its teeth. It bit Breunig. When Woitalla put up her hand to push past Kittelson and reenter the living room from the tight entryway of the front door Kittelson was standing on a slippery surface near an open staircase. Woitalla paints a different picture of the scene. In Woitalla's rendering of the altercation that precipitated her arrest, Kittelson asked her to continue their conversation outside and trapped her in the entryway leading to the front door. Woitalla simply turned around to reenter the living room, and put her hand out to try to "walk around" Kittleson so she could do so. Her conduct was not a threat of physical violence, and she did not obstruct the investigation because she did not "physically prevent" the officers from investigating the verbal argument.

The Court is obliged on Woitalla's motion to view the facts in the light most favorable to Defendants. While verbal abuse and refusing to provide identification may not violate the legal process statute, *see State v. Krawsky*, 426 N.W. 2d 875, 878 (Minn. 1988), it is at least arguable under the circumstances that the officers had probable cause to believe Woitalla "obstruct[ed], resist[ed], or interfere[d]" with their attempt to investigate the domestic disturbance. *See* Minn. Stat.§ 609.50, subd 1(2). A genuine

issue of material fact therefore exists, and the Court will deny Woitalla's motion as to the unlawful arrest claim.[5]

## CONCLUSION

Because the Court finds that there are genuine issues of material fact as to whether Woitalla consented to the entry and whether the officers had arguable probable cause to arrest Woitalla, the Court will deny her motion for partial summary judgment.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Karen Anne LeVert-Woitalla's Motion for Partial Summary Judgment [Docket No. 23] is **DENIED**.

DATED:  March 2, 2012                         _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                                   United States District Judge

---

[5] The Court notes that the facts underlying both the unlawful entry claim and unlawful arrest claim present a compelling case for dismissal of Officer Breunig on the ground of qualified immunity.  That doctrine shields government officials from personal liability under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted).  As to the unlawful arrest claim, for example, the qualified immunity inquiry echoes the above analysis, asking whether the officers had arguable, not actual, probable cause to arrest Woitalla under the circumstances.  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010).  The Court declines to address that issue, however, because the parties do not raise it at this time.